Complainant, Mayte C. Ross, received $300,000, the proceeds of certain life insurance policies upon the death of her husband, Henry Dechant, on February 9th, 1931, and on February 21st, 1931, executed a trust agreement naming William H. Berg (who later resigned), and the Savings Investment and Trust Company, a corporation of this state, as trustees. The trust indenture provided for the payment to her of the net income after deducting commissions and administration expenses and restricted the trustees to investments in securities of the class prescribed by the law of the State of New York or of the State of New Jersey.
February 24th, 1931, the trustees invested $75,000 in a mortgage participation certificate issued by the Lawyers Mortgage Company of New York, and $75,000 in a guaranteed first mortgage certificate series F-1, issued by the New York Title and Mortgage Company, secured by its terms as to principal and interest by a group of bonds and mortgages on deposit or thereafter to be deposited with the Bank of Manhattan Trust Company. The issue here is restricted to the investments mentioned.
Complainant alleges that the investments so made are not legal under the law of the State of New York; that the defendant failed to exercise due care and caution in the purchase *Page 89 
of the mortgage participation certificate in that it made no investigation, inspection or appraisal of the property covered by the mortgage and acted in the matter of both investments without the knowledge or consent of the co-trustee, Berg.
The defendant denies the illegality of the investments, and says that the complainant authorized the purchase of the certificates, directed their retention and received the income, wherefore it contends that complainant is estopped from asserting her present claims.
1. The certificate in the Lawyers Mortgage Company is one which the trustee was authorized to purchase by the statute law of New York; but it is urged by complainant that the premises covered by the mortgage were not worth more than fifty per cent. of the amount loaned, and that taxes assessed against the property were in arrears at the time the certificate was purchased.
The trustee admits that it was not familiar with the property covered by the mortgage, and that it made no independent appraisal or examination of title. But it can be said that because of this, the trustee failed to act as a reasonably prudent person? I think not. It is common knowledge that at that time (1931), bankers, financiers, lawyers, investment brokers and the public generally purchased guaranteed mortgage participation certificates in precisely the same manner. The statute which authorizes such investment by a trustee imposes no duty of inspection, appraisal and examination. In fact the statute provides "insurance policies and other instruments and evidences of title relating thereto (mortgaged property) shall be held for the benefit of such fiduciary" by a trust company or title guaranty company.
2. The investment by the trustee in the certificate of the New York Title and Mortgage Company, series F-1, was not authorized by the statutes of the State of New York.
Chapter 544 of the laws of New York for 1918 contains two sections, the first an amendment to the Decedent Estate law, section 111, and the second an amendment to the Personal Property law, section 21. The amendment of Decedent Estate law provides: *Page 90 
"Section 1. Section one hundred and eleven of chapter eighteen of the laws of nineteen hundred and nine, entitled `An act relating to estates of deceased persons, constituting chapter thirteen of the consolidated laws,' is hereby amended to read as follows: An executor, administrator, trustee or other person holding trust funds for investment may invest the same in the same kind of securities as those in which savings banks of this state are by law authorized to invest the money deposited therein, and the income derived therefrom, and in bonds and mortgages on unincumbered real property in this state worth fifty per centum more than the amount loaned thereon, and in shares or parts of such bonds and mortgages, provided that any share or part of such bond and mortgage so held shall not be subordinate to any other shares or parts thereof and shall not be subject to any prior interest therein, and provided further that bonds and mortgages in shares or parts of which any fiduciary may invest trust funds together with any guaranties of payment, insurance policies and other instruments and evidences of title relating thereto shall be held for the benefit of such fiduciary and of any other persons interested in such bonds and mortgages by a trust company or title guaranty corporation organized under the laws of this state, and that a certificate setting forth that such corporation holds such instruments for the benefit of such fiduciary and of any other persons who may be interested in such bond and mortgage among whom the corporation holding such instruments may be included, be executed by such corporation and delivered to each person who becomes interested in such bond and mortgage * * *."
The amendment of the Personal Property law, section 21, provides:
"Section 2. Section twenty-one of chapter forty-five of the laws of nineteen hundred and nine, entitled `An act relating to personal property, constituting chapter forty-one of the consolidated laws,' is hereby amended to read as follows: A trustee or other person holding trust funds for investment may invest the same in the same kind of securities as those in which savings banks of this state are by law authorized to invest the money deposited therein, and the income derived therefrom, and in bonds and mortgages on unincumbered real property in this state worth fifty per centum more than the amount loaned thereon, and in shares or parts of such bonds and mortgages, provided that any share or part of such bond and mortgage so held shall not be subordinate to any other shares or parts thereof and shall not be subject to any prior interest therein, and provided further that bonds and mortgages in shares or parts of which any trustee may invest trust funds together with any guaranties of payment, insurance policies and other instruments and evidences of title relating thereto shall be held for the benefit of such trustee and of any other persons interested in such bonds and mortgages by a trust company or title guaranty corporation organized under the laws of *Page 91 
this state, and that a certificate setting forth that such corporation holds such instruments for the benefit of such trustee and of any other persons who may be interested in such bonds and mortgages among whom the corporation holding such instruments may be included, be executed by such trust company or title corporation and delivered to each person who becomes interested in such bond and mortgage * * *."
The certificate of the New York Title and Mortgage Company, series F-1, "sells and assigns to the registered holder hereof an undivided co-ordinate share of the same amount in the principalsum secured by the bonds and mortgages or in the money secured to the company in the bonds and mortgages deposited, or which may hereafter be deposited by the company with the Bank of Manhattan Trust Company successor by merger to American Trust Company." It provides that it is one of a series of like tenor issued to an amount not exceeding in the aggregate the principal sum secured by the bonds and mortgages deposited, "or which may hereafter bedeposited," under the terms of an agreement therein referred to and discloses that the guaranty company has entered into an unconditional promise to pay within ten years from the date of the certificate the principal sum secured and accrued interest. It transfers to the holders an interest in the deposited mortgages as collateral security for its debt, and provides that the company may within three years after the first interest day pay the holder on sixty days' notice in writing the principal sum and interest. I am of the opinion that such certificate does not constitute the holder thereof an owner of a part or share in a bond and mortgage as required by the statutes of the State of New York and that such certificate is not a legal investment for fiduciaries. People v. Title and Mortgage Guarantee Co.
(Court of Appeals), 264 N.Y. 69; In re Title and MortgageGuarantee Company of Buffalo (Supreme Court, AppellateDivision), 284 N.Y.S. 335, and In the Matter of Stupack,278 N YS. 403; Prudential Insurance Co. v. Liberdar Holding Corp.,74 Fed. Rep. 2d 50; C.C.A. 2d. (Italics mine.)
I have come to the conclusion, however, that the complainant is estopped from asserting her present claim against the *Page 92 
defendant. In addition to the $300,000 of insurance money, Mrs. Ross enjoys an income of approximately $100,000 a year under the provisions of Mr. Dechant's will. Mr. Dechant was buried on February 13th, 1931, and between the date of his burial and the 22d day of February, complainant and Mr. Johnson of the Trust Company discussed the terms of the trust indenture on a number of occasions. On such occasions Johnson says the kind of investments to be made were also discussed. This, Mrs. Ross denies. William H. Berg, the original co-trustee, a business friend of the deceased husband of complainant acted as such at the time the certificate was purchased, and the investment was made with his knowledge and consent. In November, 1931, complainant married Chandler Ross. September 8th, 1932, she wrote to Mr. Berg stating that Mr. Ross spent much time investigating possible investments "and from now on will be largely responsible for my investments. In view of these facts I would like to have him as an executor on my trust in place of your hitherto most helpful self. * * * If you will kindly resign as executor I shall be pleased." Berg resigned, and Ross became co-trustee. December 11th, 1932, Mrs. Ross wrote to Mr. Johnson, vice-president of the Investment Trust, that she no longer could afford the "luxury" of an attorney, that she made it her business to become "as well informed as a mere woman can, on the management of estates by trust companies," and that Mr. Ross would pick up her stock certificates in a day or two. Under the trust agreement, complainant reserved the right to revoke the trust at any time and the privilege of increasing the principal from time to time by adding "cash, or securities," which the trustee was directed to invest and reinvest "in the same manner as is herein specified with respect to the original trust property." She added various stocks and some bonds and instructed Mr. Johnson to buy various kinds of stock and put them in the trust.
When the certificates here involved were purchased they were included by the trustee in a list showing how the total of $300,000 was invested and that list was forwarded to the *Page 93 
complainant. About one year after the purchase of the certificates Mr. Ross explained to complainant the difference in the certificates, after which complainant says she was dissatisfied. Complainant was asked "Now, what was it your husband explained to you about the certificates that you did not like? A. Your honor, he — in the first place, he said — I thought I had whole mortgages and I had certificates which were entirely different and were not what I thought I had. * * * And he explained that, and then he started to make investigations, you know what I mean, things came out in February to disturb us and we went to the bank and talked it over with them and they said we were silly and that there was nothing to it and we were unduly disturbed and that they knew that things were all right, and I insisted that they knew what they were talking about, because I had such confidence in their opinion, and, well, we had made instructions, I always thought they should take care of me because they had made the original contract and that was their business. Q. In preference to the opinion of your husband, the co-trustee, who had made investigations as the result of which he told you you didn't have any whole mortgages or interest in mortgages, and he didn't like the investment? A. Yes. Q. You didn't insist upon it? A. When I talked with the bank and they told me I was silly, so for a while I was more inclined to take their opinion, because they were old friends and they had made my purchases, they were business men, my husband was an artist and not a business man. I thought they knew much more about it than he did." Eventually she says she agreed with her husband and both signed powers of attorney in blank to sell whenever the bank thought they should be sold. "Q. You were at that time content with anything the bank might do, both you and your husband? A. Well, he thought that they knew a lot and he thought they would tend to them for us. Q. Use their judgment? A. Use their judgment, absolutely."
In October of 1932 complainant and her husband signed power of attorney to the defendant in blank to sell the securities, because as complainant says, "we didn't like them at *Page 94 
this time. We discussed them and asked him [Johnson's] opinion. We thought they should be sold, but he advised us very strongly not to sell them. * * * we told him to watch it very carefully, and, if conditions changed, to use the powers of attorney and sell them." The defendant says the power of attorney was signed upon the understanding that the bank was not to use it unless directed so to do by complainant or her husband. At that time, the market was constantly declining.
Complainant was away from February until June on an extended trip. When she returned she inquired further about the certificates. She did not instruct the trustee on her return after again talking it over, to sell the certificates. "Q. And you were again content to let it go? A. And we were content tolet it go. Q. And that is the way the matter stood. A. Until February. Q. Until February of what year? A. Of 1933, when we decided to sue the bank." (Italics mine.)
The complainant impressed me as a person above the average in intelligence and business ability, and I can come to no other conclusion than that after she was fully informed and thoroughly understood that the certificate in the New York Title and Mortgage Company, series F-1, was not a legal investment under the trust agreement, she acquiesced and was content to retain the same.
The rule is elementary that where a cestui que trust, expressly or by her acquiescence, authorizes the trustee to make or retain a non-legal investment, she may not afterwards complain of the illegality of the investment. "The conduct on the part of those who are interested in the trust may be such as to preclude their right to complain of the conduct of the trustees, if the security should turn out to be insufficient. Thus if a trustee makes an improper investment of the trust fund, * * * or improperly retains investments left by the settlor without objection from the beneficiary, or if the cestui que trust
acquiesces in, or consents to, the investment, the trustee will not be held liable to make good a loss arising from such investment; * * *." 65 Corp. Jur. 817 § 699. *Page 95 
"A beneficiary who, subsequently to a breach of trust, acquiesces in it, cannot maintain a suit for relief against those who would otherwise have been liable. The acquiescence, in order to produce this effect, must take place with full information by the beneficiary of all the facts, and with full knowledge of his legal rights arising from those facts." 3 Pom. Eq. Jur. § 1083.
"It is established by all the cases, that if the cestui quetrust joins with the trustees in that which is a breach of trust, knowing the circumstances, such a cestui que trust can never complain of such a breach of trust. I go further, and agree that concurrence in the act or acquiescence without original concurrence will release the trustees." Lord Eldon in Walker v.Symonds, 3 Swanst 1, 64; 36 Eng. Rep. (1818) 751, 774.
In investment by trustees the conduct on the part of those who are interested may be such as to preclude their right to complain if the security afterwards turns out insufficient. Farrar v.Barraclough, 65 Eng. Rep. (10 Vice-Chancellors) 378; 2 Sm. Giff. 231.
No cestui que trust can claim that to be a breach of trust which has been done under her own sanction, whether by her previous request or consent or by her subsequent ratification. The application of the doctrine is, in effect, equivalent to an application of the maxim "volenti non fit injuria." In re Leupp,108 N.J. Eq. 49.
 I will advise decree dismissing the bill of complaint. *Page 96